Oliver R. GRACE, Lorraine Grace, Morgan H. Grace and Gerald I. White, Trustee of the John E. Grace Trust, individually, and as stockholders of Briggs Leasing Corporation suing on behalf of themselves and for the benefit of said corporation and for the class of all other stockholders of said corporation similarly situated, Plaintiffs,

v.

Robert ROSENSTOCK, Robert Genser, Edward Rosenstock, Briggs Leasing Corporation and Briggs Acquisition Corporation, Defendants.

No. 85–CV–2039 (RML).

United States District Court,
E.D. New York.

Oct. 29, 1998.

Sidney Bender, Leventritt, Lewites & Bender, New York City for Plaintiffs.

Herbert Rubin, Herzfeld & Rubin, New York City, for Defendants.

## MEMORANDUM AND ORDER

LEVY, United States Magistrate Judge.

Plaintiffs [1] are minority shareholders of de-

1. Named plaintiffs Oliver R. Grace and Morgan H. Grace are deceased. By order dated November 6, 1996, plaintiffs were permitted to substitute named plaintiff Lorraine Grace, as Executrix of the Estate of Oliver R. Grace, for Oliver R. Grace and plaintiff Gerald I. White, as Executor

fendant Briggs Leasing Corporation,[2] a public corporation that was in the business of leasing automobiles to individuals and businesses. They commenced this action individually, as a class, and derivatively to rescind and reform a "freeze-out" merger, under federal and state law, and for money damages and other appropriate relief. Plaintiffs' amended complaint, filed on July 1, 1985,[3] alleges that the merger violated Section 10(b) of the Securities Exchange Act of 1934, Rule 10b–5 promulgated thereunder, N.Y.Bus. Corp.Law § 605(a), and the exception stated in Section 623, subd. (K) of the N.Y.Bus. Corp.Law.[4] Plaintiffs also seek damages for breach of fiduciary obligation under New York state law.

By order dated August 14, 1986, the Honorable Mark A. Costantino, United States District Judge, granted plaintiffs' motion to certify this action as a class action, pursuant to Rules 23(a) and 23(b) of the Federal Rules of Civil Procedure. By order dated March 17, .1994, the Honorable Sterling Johnson, Jr., United States District Judge, entered a default judgment on the issue of liability against defendants Briggs Leasing Corporation ("Briggs") and Briggs Acquisition Corporation. Judge Johnson further ordered that plaintiffs be permitted to conduct discovery as necessary and directed that an inquest on damages be held. On August 12, 1997, pursuant to a stipulation so ordered by the Honorable David G. Trager, United States District Judge, judgment was entered against Briggs in the amount of $4,028,000 and against Robert Rosenstock, the Vice President and a Director of Briggs, in the amount of $6,912,288. Defendant Edward Rosenstock, the former Chairman, Chief Executive Officer, and President of Briggs, is deceased and no estate has been substituted for him. By stipulation dated November 7, 1997, the remaining parties consented to re-

fer this case to a Magistrate Judge for all purposes, including the entry of judgment.

The primary transaction charged in the amended complaint is the alleged freeze-out merger, on or about February 26, 1985, of the minority shareholders of Briggs. Plaintiffs claim that the self-interested defendants effectuated the merger through the use of a materially false proxy statement, thereby freezing out the minority shareholders at the allegedly inadequate price of $1.50 per share. Specifically, the amended complaint charges that the proxy statement was materially misleading in that it failed to disclose, among other things, the improper diversion of corporate opportunities by Robert Rosenstock ("Rosenstock") and Robert Genser ("Genser"), who collectively owned seventy-two percent of the outstanding stock of Briggs. The bench trial against Robert Genser, the sole remaining defendant in this case, commenced on March 30, 1998 and ended on April 2, 1998.

## BACKGROUND

Robert Genser was a Vice President, Secretary–Treasurer and Director of Briggs. (Trial Transcript ("Tr.") at 352; Plaintiffs' Exhibit 1 at 2.) On January 10, 1985, Genser and Rosenstock each contributed all of their shares in Briggs (29,961 and 384,350 shares, respectively) to Briggs Acquisition Corporation ("BAC"), a shell corporation, and received one share of common stock of BAC in exchange for each share of Briggs. As a result of that transaction, Genser and Rosenstock became the sole shareholders of BAC. After an additional contribution of 17,516 shares of Briggs stock by Rosenstock (which he purchased from his father, Edward Rosenstock, for $1.50 per share), BAC owned approximately seventy-two percent of the outstanding common stock of Briggs.

---

of the Estate of Morgan H. Grace, for Morgan H. Grace in this action.

**2.** The named plaintiffs were the beneficial owners of 7,476 common shares of Briggs, or approximately 1.25 percent of the 595,728 outstanding shares of Briggs common stock. (*See* Plaintiffs' Pre–Trial Memorandum at 3.) As of September 25, 1985, Briggs had approximately 190 shareholders. (*Id.*) Robert Rosenstock's sister and brother-in-law, Adrienne Rosenstock

Halperin and James Halperin, owned 79,170 shares of Briggs, or approximately 13 percent of the outstanding common stock. (*Id.* at 5 n. 2.)

**3.** Plaintiffs originally commenced this action by a complaint dated June 3, 1985.

**4.** By order dated September 30, 1996, the court granted plaintiffs' motion to withdraw their claim under the Martin Act, N.Y.Gen.Bus.Law § 352–c.

By letter dated January 28, 1985, Briggs notified its shareholders that a special meeting would be held on February 25, 1985 for the purpose of voting on the proposed merger of BAC and Briggs, with Briggs to be the surviving company wholly owned by Genser and Rosenstock. The letter informed the shareholders, however, that "irrespective of the vote" of the minority shareholders, approval of the merger was assured because BAC, as the majority stockholder, planned to vote in favor of the merger. The notice also informed the shareholders that they would be bought out at $1.50 per share upon consummation of the merger.

The purported reason for the merger was to relieve Rosenstock and Genser of the burden of personally guaranteeing the debt of a public corporation. Briggs had obtained a fair amount of credit from General Motors Acceptance Corporation ("GMAC") in connection with its purchases of automobiles and, in order to induce GMAC to extend such credit—which in January 1985 was in the amount of approximately $14 million—both Rosenstock and Genser had executed personal guarantees on the debt. As Briggs began to suffer reduced profits, allegedly as a result of increased competition in the auto leasing business from the major automobile manufacturers, Rosenstock and Genser decided to take the company private, purportedly in the hopes of turning it into a franchise for one of the major automobile manufacturers. (Trial Memorandum of Robert Genser at 3–4.)

Attached to the notice of the special meeting was a proxy statement which explained, *inter alia:*

> [I]t is proper for Rosenstock and Genser to have the total ownership, and receive all of the earnings, of the Company [because they personally guaranteed the company's debt incurred by purchasing automobiles].... Rosenstock and Genser believe that they should receive the full benefit of any future increase in the equity and earnings of the Company.

(Plaintiffs' Exhibit 1 at 6.) The proxy statement further explained that Briggs had hired Prudential–Bache Securities to render an opinion on the appropriate price for shares owned by the minority shareholders, who would lose their interests in Briggs as a result of the merger. Based on its review of the corporate records, Prudential–Bache gave the Board of Directors an opinion that $1.50 per share would be a fair price for the minority stock. (*Id.* at 10.)

In addition, the proxy statement listed the book value of Briggs's real estate as $884,-503, but disclosed an accumulated appreciation of $419,031 and noted that the company had recently obtained a first mortgage loan on the property in the face amount of $1 million. With regard to the real estate, the financial statement disclosed that there had been some preliminary discussions with architects and community officials about development of the property, but that no such plans had been finalized and that land use regulations "may restrict or totally eliminate the company's ability to continue to conduct its business at such premises." (*Id.* at 15.)

Finally, the proxy statement revealed that any shareholders dissenting from the merger had the right, pursuant to section 623 of New York's Business Corporation Law, to seek an appraisal by filing a written objection with the company prior to the vote. The proxy statement described the appraisal process in detail, and the full text of section 623 was annexed to it. (*Id.* at 11–13; C–1–C–5.)

At the meeting on February 26, 1985, plaintiffs voted against the merger. Nonetheless, based solely on BAC's vote, the proposal was adopted and the merger became effective, with Genser and Rosenstock remaining as the sole shareholders of Briggs, Genser owning seven percent (7%) and Robert Rosenstock owning ninety-three percent (93%) of the common stock.

All of the above facts are undisputed. (*See* Joint Pretrial Order, dated June 27, 1997, at 1–3.) The parties' dispute centers around the valuation of the shares of Briggs and whether or not the proxy statement accompanying the notice of special meeting contained materially misleading misrepresentations and omissions concerning the value of the shares. According to plaintiffs, the fair value of Briggs, based on the true value of its real estate holdings at the time, was in excess of $5.00 per share. They claim, based on an appraisal of the real estate that was conducted in 1987, that Rosenstock and Genser deliberately "timed the merger to take

advantage of the upward surge in the value of its real estate, and thus to deprive the plaintiffs from participating in that dramatic improvement value."

Plaintiffs also contend that the proxy statement accompanying the notice of special meeting contained materially misleading representations and omissions because it

failed to disclose that the individually named defendants voted for and approved the merger because it was a necessary step in the consummation of a plan and scheme to divert to the individually named defendants, as sole shareholders of BRIGGS, the real property owned by BRIGGS which, once diverted to their sole control, was to be developed or sold for the 100% personal benefit of Rosenstock and Genser.

(Plaintiffs' Pre–Trial Memorandum at 7.) The proxy statement represented that it was proper for Genser and Rosenstock to own one hundred percent of Briggs and receive all of its income because they personally guaranteed the company's debts. Plaintiffs contend, however, that the proxy statement failed to disclose that Charlotte Rosenstock, Robert Rosenstock's mother, was the primary guarantor of those debts until January 1985. According to plaintiffs, Genser and Rosenstock first guaranteed the company's debts in late 1984, "when they did so for the first time in order to add an illusory business purpose and justification for the purported merger." *Id.* Plaintiffs further argue that, in fact, those guarantees, principally running to GMAC, "are in a real sense meaningless since such debt is fully collateralized by chattel mortgages on the purchased automobiles" and that it is therefore "extremely unlikely that such guarantees would ever be called by General Motors." (*Id.* at 7–8.)

Plaintiffs also argue that the proxy statement was misleading in that it failed to disclose "the existence and value of legal claims of BRIGGS against the individually named defendants for repeated and long standing diversions of corporate funds for their own personal use and benefit." (*Id.* at 8.) Although the proxy statement listed each director's cash compensation for 1984, plaintiffs contend that "their actual and unreported compensation vastly exceeded those amounts" because those individuals had been using Briggs "as a personal cash box to defray tax-free the expenses incurred in pursuit of their opulent lifestyles" and charging Briggs excessive amounts and under-compensating it for its services in transactions between Briggs and companies owned by Rosenstock and Genser. (*Id.*)

Plaintiffs' primary contention, however, relates to Briggs's interest in real estate, which consisted of a fee interest in 67,000 square feet, and a lease on an additional 23,000 square feet under a long-term ninety-nine year lease, of property located at 777 Northern Boulevard in Great Neck, New York. (*Id.* at 7.) According to plaintiffs, the $1.50 share price offered to the minority shareholders was based on a valuation of Briggs's real estate at $479,000, when in fact it had a fair market value of $2,530,000. (Plaintiffs' Post–Trial Memorandum at 4.)

Plaintiffs also allege that Rosenstock and Genser caused Briggs to execute various notes and mortgages on that property, the proceeds of which went largely to Rosenstock and Genser personally (or were used for their personal benefit), to Belgrave Oldsmobile, Inc. and RER Motors, Inc. (companies owned by Rosenstock and Genser), or to Briggs Ford, an agency "that was going to be owned" by Robert Rosenstock and his mother, sister, and brother-in-law. (Plaintiffs' Pre–Trial Memorandum at 9–10.) As a result, plaintiffs claim that Rosenstock and Genser, as directors of Briggs, breached their fiduciary duties to Briggs and to plaintiffs by enriching themselves in the amount of "at least $6,314,000" at Briggs's expense and by causing Briggs to incur obligations that rendered it insolvent. (*Id.* at 11.)

*Discussion*

1. *Causation Under Rule 10b–5*

Rule 10b–5, promulgated under section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n, provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange—

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5 (1996).

Section 10b–5 is a "catch all" that generally prohibits the use of manipulative or deceptive devices "in connection with" the purchase or sale of securities. David M. Brodsky & Daniel J. Kramer, *Federal Securities Litigation* 6–1 (1997). To sustain a claim under section 10b–5, a plaintiff must prove (1) a misrepresentation or omission; (2) of a material fact; (3) made with scienter; (4) that plaintiff relied upon; and (5) that caused plaintiff's injury. *See Basic Inc. v. Levinson,* 485 U.S. 224, 230–31, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988); *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.,* 75 F.3d 801, 808 (2d Cir.1996); *Brown v. E.F. Hutton Group, Inc.,* 991 F.2d 1020, 1031 (2d Cir.1993).

At issue here is whether plaintiffs can demonstrate causation of damages, even assuming, *arguendo,* they can prove a misrepresentation made with the requisite scienter in connection with a purchase or sale of securities. *Virginia Bankshares, Inc. v. Sandberg,* 501 U.S. 1083, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991), controls. In that case, a shareholder who owned eighty-five percent of a company's stock moved to freeze out the remaining fifteen percent in a merger. The proxy statement concerning the vote on the proposed merger stated that the minority shareholders would be offered $42 per share, and that the directors believed this price was "fair" to the minority shareholders because $42 was a price above book value and market price. The evidence indicated, however, that the company possessed factual information suggesting that the minority shareholders' shares were worth at least $60 on the open market. *Id.* The Court held that such a dichotomy between the evidence in the company's possession and the particular dollar value it assigned to minority shareholders'

shares in the proxy statement could be actionable as a material misrepresentation under S.E.C. Rule 14a–9, promulgated under the Securities Exchange Act of 1934 (the "34 Act"). *Id.* at 1097, 111 S.Ct. 2749.

The second issue in that case, however, was causation of damages. Justice Souter's majority opinion first discussed the Court's previous consideration of the causation issue in the context of the implied private right of action arising under § 14(a) of the '34 Act. It summarized *Mills v. Electric Auto–Lite Co.,* 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970), in which the Court held that one could establish causation of damages by a materially misleading proxy solicitation by showing that the proxy solicitation was an "essential link" in the accomplishment of the transaction. *Virginia Bankshares,* 501 U.S. at 1100, 111 S.Ct. 2749 (citing *Mills,* 396 U.S. at 385, 90 S.Ct. 616). The Court then found that there was no causation in the case before it, and thus no implied private right of action, because the vote of the majority shareholder was legally sufficient to authorize the merger. *Id.* at 1106, 111 S.Ct. 2749. Because no other shareholder could affect the result of the voting, the proxy statement was not an "essential link" in accomplishing the freeze-out merger. *Id.* at 1102, 111 S.Ct. 2749.

The minority shareholders in *Virginia Bankshares* had posited two theories of causation. The first theory was that the directors' desire to avoid the minority shareholders' ill will by use of a misleading proxy solicitation provides the requisite causal nexus between the proxy statement and the merger. This theory was based on the premise that, in the face of an unfavorable minority shareholder vote, a board of directors might choose not to go forward with the transaction, even though the majority shareholder had the voting power to single-handedly authorize the transaction. The Court rejected this theory because it would "turn on inferences about what the corporate directors would have thought and done without the minority shareholder approval" and therefore would give rise to "speculative claims and procedural intractability." *Id.* at 1105–06, 111 S.Ct. 2749.

The second theory was that minority approval, while unneeded to authorize the transaction, would result in a loss of state law remedies. The plaintiffs argued that a favorable minority vote induced by a materially misleading proxy solicitation would preclude a minority suit attacking the merger on state law grounds, and that the forfeiture of such a state law remedy should be sufficient to demonstrate causation. The Court in *Virginia Bankshares*, although not rejecting this theory, declined to decide its merits because a favorable minority vote would not have rendered the transaction invulnerable to attack under Virginia law, which barred shareholders from seeking to avoid a transaction if the minority shareholders ratified the transaction following disclosure of the material facts and conflicts of interest. *Id.* at 1107–08, 111 S.Ct. 2749 (citing Va.Code Ann. § 13.1–691(A)(2) (1989)). Because the plaintiffs could not demonstrate that the proxy solicitation actually resulted in the loss of state law remedy, the Court did not have to accept or reject the loss-of-state-law remedy theory of causation.

The Second Circuit, however, explicitly adopted the loss-of-state-law remedy causation theory in *Wilson v. Great Am. Indus., Inc.*, 979 F.2d 924 (2d Cir.1992). In *Wilson*, minority shareholders sued the majority shareholders of the defendant corporation in a section 14(a) and Rule 14a–9 suit for injuries suffered because of a materially misleading proxy solicitation. The defendants had solicited the plaintiffs' votes for approval of a proposed freeze-out merger, although those votes were unnecessary to ratify the transaction. After exchanging their shares pursuant to the merger agreement and thereby forgoing their appraisal rights, the minority shareholders discovered that they had accepted an unfair exchange ratio for their shares based on material misrepresentations in the proxy statement. The plaintiffs based their suit on the theory of loss of a state law remedy—in this case appraisal rights. The Second Circuit held that minority shareholders may assert such a claim, though the court remanded the case for determination of whether the loss had actually occurred. *Id.* at 929–31; *see also Howing Co. v. Nationwide Corp.*, 972 F.2d 700, 708–09 (6th Cir. 1992) (holding that the loss of a state law

remedy creates a federal action under § 13(e) of the Securities Exchange Act), *cert. denied*, 507 U.S. 1004, 113 S.Ct. 1645, 123 L.Ed.2d 266 (1993); *Thouret v. Hudner*, No. 95 Civ. 1793(JSM), 1996 WL 38824, at *2–3 (S.D.N.Y. Feb. 1, 1996) (holding that there was no private right of action under § 14(a) where minority stockholder votes were "totally unnecessary and irrelevant to the passage of the directors' proposal for the election of directors at the annual shareholders' meeting," and distinguishing cases where "minority shareholders have given up state law remedies, such as appraisal rights, as a result of false and misleading statements contained in a proxy statement").

While *Virginia Bankshares* and *Wilson* addressed only claims under section 14(a), their reasoning and conclusions apply to all types of misrepresentations in connection with a merger, and therefore to claims brought under § 10(b). *See Scattergood v. Perelman*, 945 F.2d 618, 625 (3d Cir.1991) (barring minority shareholders' § 10(b) claims concerning freeze-out merger for lack of causation); *Booth v. Connelly Containers, Inc.*, Civ. A. No. 89–8280, 1991 WL 171450, at *8 (E.D.Pa. Aug.30, 1991) (dismissing minority shareholders' 10b–5 claims and explaining that even if defendants had "misrepresented the value of [the] shares and capital assets, omitted material facts, and breached their fiduciary duties," the plaintiffs could not demonstrate causation under *Virginia Bankshares* because the defendants had the requisite votes to consummate the freeze-out merger); *cf. Basic, Inc. v. Levinson*, 485 U.S. at 231–32, 108 S.Ct. 978 (expressly adopting the standard of materiality set out in the § 14(a) context as applicable to the § 10(b) context); *Goldberg v. Meridor*, 567 F.2d 209, 222 n. 3 (2d Cir.1977) ("The test for materiality under 14a–9 and 10b–5 is the same.").

Plaintiffs here do not contend that they waived any appraisal rights under New York law in reliance on the alleged misrepresentations in the proxy statement, or that an appraisal remedy was unavailable to them. Rather, applying the reasoning of *Wilson* to the instant case, plaintiffs argue that the allegedly deceptive proxy statement caused their injury "because the minority sharehold-

ers could have sought an *injunction* under New York law had the defendants not lulled the minority shareholders into security by the deceptive disclosure." (Letter from Sidney Bender to the Court, dated August 7, 1998, at 6 (emphasis added).)[5] However, plaintiffs cite no authority for the proposition that they would have been entitled to seek an injunction under New York State law.[6] Plaintiffs' claim for breach of fiduciary duty would not entitle them to injunctive relief—even if they were to prevail on that cause of action—but only to monetary damages. *Benson v. RMJ Secs. Corp.*, 683 F.Supp. 359, 370 n. 17 (S.D.N.Y.1988). In addition, although injunctive relief is available under New York's Martin Act, N.Y.Gen.Bus.Law § 352–c, (*People v. Concord Fabrics, Inc.*, 83 Misc.2d 120, 371 N.Y.S.2d 550, 553 (Sup.Ct. N.Y. County 1975), *aff'd*, 50 A.D.2d 787, 377 N.Y.S.2d 84 (1st Dep't 1976)), that remedy is only available to the State Attorney General, and not to private litigants (*see Goldberg*, 567 F.2d at 224 n. 7 (Meskill, J. dissenting); *Loengard v. Santa Fe Indus. Inc.*, 639 F.Supp. 673, 676 (S.D.N.Y.1986), *cause dismissed*, 812 F.2d 712 (2d Cir.1987), *certified question answered by*, 70 N.Y.2d 262, 519 N.Y.S.2d 801, 514 N.E.2d 113 (1987); *CPC Int'l Inc. v. McKesson Corp.*, 70 N.Y.2d 268, 275, 519 N.Y.S.2d 804, 514 N.E.2d 116 (1987)). However, as noted above, plaintiffs withdrew their Martin Act claim in this case on September 30, 1996.

Finally, although the Second Circuit in *Goldberg* held that the minority shareholders in that case had the ability to seek injunctive relief under New York State law, such relief was available because the shareholders had no appraisal right in that transaction. *See Goldberg*, 567 F.2d at 219 ("*Where an appraisal remedy is not available*, the courts of New York have displayed no hesitancy in granting injunctive relief.") (emphasis added). The contrary is true here. Indeed, New York law is clear that where an appraisal proceeding is available, that remedy is exclusive, even if not exercised. *Norte & Co. v. New York and Harlem R. Co.*, 222 A.D.2d 357, 635 N.Y.S.2d 629, 630 (1st Dep't 1995); *see also Alpert v. 28 Williams St. Corp.*, 63 N.Y.2d 557, 568, 483 N.Y.S.2d 667, 473 N.E.2d 19 (1984) ("The pursuit of an appraisal proceeding generally constitutes the dissenting stockholder's exclusive remedy."); *Breed v. Barton*, 54 N.Y.2d 82, 85, 444 N.Y.S.2d 609, 429 N.E.2d 128 (1981) ("When [the dissenting shareholders] exercised the right . . . to have their stock appraised in a judicial proceeding, they abandoned their alternative rights as shareholders."); *Willcox v. Stern*, 18 N.Y.2d 195, 201, 273 N.Y.S.2d 38, 219 N.E.2d 401 (1966) ("[W]here a merger is consummated in accordance with statutory procedures, the remedy of appraisal and payment is the only one available to dissenting stockholders."); *Blumenthal v. Roosevelt Hotel*, 202 Misc. 988, 115 N.Y.S.2d 52 (Sup. Ct.N.Y. County 1952) (denying injunction of corporate asset sale and dismissing complaint because statutory remedy of appraisal was exclusive).[7] Plaintiffs therefore would likely

---

5. I am compelled to note that plaintiffs raised this issue for the first time four months after the trial in response to a request from the court that they address the impact of *Virgin Bankshares* on their claims.

6. Although the amended complaint alludes to "[t]he likely ability to enjoin the merger under New York law" (Amended Complaint ¶ 21), plaintiffs never specifically allege that they would have sought to enjoin the merger had the facts not been concealed.

7. As will be explained in more detail *infra*, an exception to the exclusivity of the appraisal remedy applies where a shareholder suing in his or her individual capacity seeks equitable relief based on the assertion that the corporate action is fraudulent or illegal. *Pellman v. Cinerama, Inc.*, 503 F.Supp. 107, 110 (S.D.N.Y.1980) ("appraisal is not an exclusive remedy when the shareholder sues on grounds of fraud or illegali-

ty" and therefore "[f]ederal courts should invoke state appraisal proceedings as an exclusive remedy only when a complaint is clearly limited to state-law fiduciary claims"); *Alpert*, 63 N.Y.2d at 568, 483 N.Y.S.2d 667, 473 N.E.2d 19 ("An exception exists [to the exclusivity rule] when the merger is unlawful or fraudulent as to that shareholder, in which event an action for equitable relief is authorized."); *see also* N.Y.Bus.Corp. Law § 623(k) (McKinney 1986) (enforcement of appraisal rights by a shareholder excludes enforcement of any other right to which he or she might otherwise be entitled, except "that this section shall not exclude the right of such shareholder to bring or maintain an appropriate action to obtain relief on the ground that such corporate action will be or is unlawful or fraudulent as to him"). However, plaintiffs' argument is that they "could" have sought an injunction "had the defendants not lulled the minority shareholders into security by the deceptive disclosure." Obviously, then, if there were no "de-

not have had the ability to seek injunctive relief.

At any rate, even if the remedy of seeking an injunction were available, to establish causation under this theory, plaintiffs must do more than simply assert that they would have sought to enjoin a transaction under state law if certain relevant information had been disclosed. They must show by a fair preponderance of the evidence that they would have *succeeded* in preventing the loss they sustained. *Benson*, 683 F.Supp. at 370 (citing *Madison Consultants v. FDIC*, 710 F.2d 57, 65 (2d Cir.1983)); *see also Mayer v. Oil Field Sys. Corp.*, 721 F.2d 59, 67 (2d Cir.1983) (plaintiff had to establish not only an available state court remedy, but that "he would have succeeded in preventing the loss he in fact suffered"). Plaintiffs have not even asserted a theory under which they might have been entitled to injunctive relief under state law, let alone attempted to meet their burden of demonstrating that such a claim would have been successful, and this court will not carry that burden for them. *See Boone v. Carlsbad Bancorporation, Inc.*, 972 F.2d 1545, 1559 (10th Cir.1992) (dismissing Rule 14a–9 claims of minority shareholders where plaintiffs "failed to affirmatively declare that certain withheld or misstated information would (or even probably would) have caused them to seek a state court injunction").

I therefore find that plaintiffs have failed to demonstrate a loss of a state law remedy sufficient to demonstrate causation under Rule 10b–5. Plaintiffs have not proved that they forfeited or otherwise lost any remedies under New York state law as a result of the alleged misrepresentations in the proxy statement. Accordingly, *Virginia Bankshares* mandates dismissal of plaintiffs' claims under § 10(b) and Rule 10b–5.

### 2. *Remedies Under New York State Law*

Plaintiffs' remaining claims allege Briggs's failure, under New York law, to pay them "fair value" for their shares and seek monetary damages against defendant Genser for breach of fiduciary duty. 28 U.S.C. § 1367(a) states:

> in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

Pursuant to 28 U.S.C. § 1367(c)(3), a district court may decline to exercise supplemental jurisdiction over a state law claim under subsection (a) if "the district court has dismissed all claims over which it has original jurisdiction." Because plaintiffs' federal securities law claims have been dismissed, then, the court has discretion to dismiss plaintiffs' state claims for want of jurisdiction. *Brotherhood of Locomotive Eng'rs Div. 269 v. Long Island R.R. Co.*, 85 F.3d 35, 39 (2d Cir.1996) (" 'When all bases for federal jurisdiction have been eliminated ..., the federal court should ordinarily dismiss the state claims.' ") (quoting *Baylis v. Marriott Corp.*, 843 F.2d 658, 665 (2d Cir.1988)); *see also Lennon v. Miller*, 66 F.3d 416, 426 (2d Cir. 1995) (dismissing supplemental state claim where court dismissed underlying federal claim); *Block v. First Blood Assocs.*, 988 F.2d 344, 351 (2d Cir.1993) (refusal to exercise supplemental jurisdiction over investors' state law claims was proper upon dismissal of investors' federal securities claims); *Shahzad v. H.J. Meyers & Co.*, 923 F.Supp. 57, 60–61 (S.D.N.Y.1996) (declining to exercise supplemental jurisdiction over state claims after dismissing investor's federal securities fraud claims); *Bilick v. Eagle Elec. Mfg. Co.*, 807 F.Supp. 243, 257 (E.D.N.Y.1992) (because no federal claims remained, plaintiffs' state law claims relating to federal securities fraud action also had to be dismissed).

 Nonetheless, if the court and the parties have expended substantial time and energy on the case prior to the disposition of the federal claim, the court may justifiably retain supplemental jurisdiction over state

---

ceptive disclosure," logic dictates that plaintiffs would not be able to assert unlawful or fraudulent conduct and would therefore not have any right to equitable relief. Moreover, this court is aware of no New York case, and plaintiffs have certainly cited none, in which dissenting shareholders who had the right to procure an appraisal of their stock successfully sued to enjoin a corporate transaction.

claims that derive from a common nucleus of operative fact. *See Enercomp, Inc. v. McCorhill Pub., Inc.*, 873 F.2d 536, 545 (2d Cir.1989) (district court properly exercised pendent jurisdiction over state law claims where sole federal claim was dismissed during trial); *Philan Ins. Ltd. v. Frank B. Hall & Co.*, 786 F.Supp. 345, 347 (S.D.N.Y.1992) (district court may exercise supplemental jurisdiction over state claims subsequent to dismissal of federal claims, despite lack of independent basis for jurisdiction, if substantial resources have already been expended in action). This case was filed over thirteen years ago, the trial has taken place, and both the parties and the court have devoted substantial resources in this action. Indeed, the original judge and at least three parties to this case have passed away since its inception, and further delays would be unwarranted. Accordingly, although the court is hard-pressed to understand why defendant Genser opted to defend this case at trial rather than attempt to resolve it by dispositive motion, in the interests of judicial economy the court will extend supplemental jurisdiction and address plaintiffs' state law claims.

As explained above, plaintiffs' state law claims derive from the New York Business Corporation Law ("B.C.L.") and the common law concerning breach of fiduciary duty. Article 9 of the B.C.L. authorizes any two or more domestic corporations to merge into a single corporation, which shall survive as one of the constituent corporations participating in the merger. *See* B.C.L. § 901. The B.C.L. establishes procedures for the approval of a plan of merger by the board of each constituent corporation (B.C.L. § 902) and for its submission to the shareholders of each for their authorization by a two-thirds vote. *Id.* § 903. Section 623 of the B.C.L. recognizes a shareholder's right to object to corporate action, including merger, and establishes procedures for a dissenting shareholder to elect and demand payment of the fair value of his or her shares. If the corporation fails to make a written offer to each electing shareholder to pay for his or her shares at a specified price that the corporation considers fair, or if any dissenting shareholder or shareholders disagree with the price offered, a special proceeding may be instituted in state court to determine the rights of the dissenting shareholders and to fix the fair value of their shares. *Id.* § 623(g), (h). Either the corporation (*id.* § 623(h)(1)) or the dissenter may institute such a proceeding (*id.* § 623(h)(2)), but the latter may only act upon the former's failure to do so.

In the event an appraisal proceeding is commenced, B.C.L. § 623(h)(4) provides:

> The court shall determine whether each dissenting shareholder ... is entitled to receive payment for his shares. If the ... court finds that any dissenting shareholder is so entitled, it shall proceed to fix the value of the shares, which, for the purposes of this section, shall be the fair value as of the close of business on the day prior to the shareholders' authorization date.

In addition, B.C.L. § 623(k) provides, in pertinent part:

> The enforcement by a shareholder of his right to receive payment for his shares in the manner provided herein shall exclude the enforcement by such shareholder of any other right to which he might otherwise be entitled by virtue of share ownership, ... except that this section shall not exclude the right of such shareholder to bring or maintain *an appropriate action* to obtain relief on the ground that such corporate action will be or is unlawful or fraudulent as to him. (emphasis added)

It is the exception stated in subdivision (k) that plaintiffs invoke in support of their right to bring state law claims against Robert Genser in this action, which leads to the obvious question: what is an "appropriate" action?

The "appropriate" action referred to in subdivision (k) has been held to be "one in which a dissenting shareholder seeks some form of equitable relief." *Breed*, 54 N.Y.2d at 87, 444 N.Y.S.2d 609, 429 N.E.2d 128; *see also Burke v. Jacoby*, 981 F.2d 1372, 1380 (2d Cir.1992) ("An 'appropriate action' within the meaning of § 623(k) is an action seeking equitable relief, and that type of action and the exercise of the right of appraisal are the dissatisfied stockholder's only avenues of relief."). As the New York Court of Appeals explained in *Breed*, limiting the exception in subdivision (k) to equitable relief "serves the valid function of denying dissenting shareholders the ability to reopen prior appraisal

proceedings and again seek the identical relief merely by alleging fraudulent or unlawful corporate conduct in relation to the merger." *Breed,* 444 N.Y.S.2d 609, 429 N.E.2d at 130. Although plaintiffs alleging fraud in an equitable proceeding under subdivision (k) may also seek money damages, the equitable relief must be the primary request, and such damages must be incidental to a grant of equitable relief. *Id.* at 131; *see also Burke,* 981 F.2d at 1380 ("Money damages are not available except as ancillary to a grant of traditionally equitable relief.") (citation and internal quotations omitted); *Staskus v. Rawlplug Co.,* No. 92 Civ. 3069, 1993 WL 212736, at *6 (S.D.N.Y. June 11, 1993) (shareholders' state law claims were barred by section 623(k) where plaintiffs expressed no preference for rescission over appraisal and "appear[ed] to attach equal importance to each of their remedial choices"); *Direct Media/DMI, Inc. v. Rubin,* 171 Misc.2d 505, 654 N.Y.S.2d 986, 989 (Sup.Ct.N.Y. County 1997) ("[A] shareholder may not seek an appraisal and also commence a separate action to recover money damages for improper corporate action . . . .").[8]

▮ At this point in the case, plaintiffs are no longer seeking any form of traditional equitable relief, such as dissolution or rescission of the merger. Their state law claims against Robert Genser, as the sole remaining defendant in this case, seek purely monetary relief. Although plaintiffs' complaint originally requested the equitable remedy of rescission, the case—in its present state—seeks only damages. It therefore suffers from a "fatal absence of any primary request for equitable relief" (*Breed,* 54 N.Y.2d at 87, 444 N.Y.S.2d 609, 429 N.E.2d 128) and is barred by the rule of exclusivity set forth in section 623(k). *See Walter J. Schloss Assocs. v. Arkwin Indus., Inc.,* 61 N.Y.2d 700, 472 N.Y.S.2d 605, 460 N.E.2d 1090 (1984) (adopting dissenting opinion of Mangano, J.), *rev'g,* 90 A.D.2d 149, 455 N.Y.S.2d 844 (2d Dep't 1982); *see also Burke,* 981 F.2d at 1381 (affirming district court's dismissal of minority shareholder's state law claim for breach of fiduciary duty where complaint sought only compensatory and punitive damages and an accounting, but "made no attempt to obtain traditionally equitable relief such as a rescission").

▮ In addition, derivative claims brought by shareholders on behalf of the corporation, and not in their individual capacities, do not fall under the exception to the exclusivity rule in § 623(k). *Norte & Co.,* 635 N.Y.S.2d at 630–31; *see also Breed,* 54 N.Y.2d at 86, 444 N.Y.S.2d 609, 429 N.E.2d 128 ("It is evident from the express language of subdivision (k) that this exception to the general rule of exclusivity of the appraisal remedy permits a shareholder to pursue an appropriate action only in his individual capacity and not as the instigator of a derivative suit."). Here, plaintiffs' claim against Genser for breach of fiduciary duty is derivative in nature. *Norte & Co.,* 635 N.Y.S.2d at 630–31; *see also Abrams v. Donati,* 66 N.Y.2d 951, 953, 498 N.Y.S.2d 782, 489 N.E.2d 751 (1985) ("[A]llegations of mismanagement or diversion of assets by officers or directors to their own enrichment, without

---

**8.** Plaintiffs point out that in February of 1986, Judge Costantino denied a motion by Briggs and BAC to stay the proceedings in this court in order to permit appraisal proceedings to go forward in state court. In his Memorandum and Order, Judge Costantino held that the exception in § 623(k) applied to this case because it was an equitable action. At that time, obviously, Briggs and BAC were parties to this action and plaintiffs were seeking the equitable remedy of rescission. Plaintiffs have since settled their claims against Briggs, Robert Genser is the sole remaining defendant in this case, and there is no indication that plaintiffs continue to seek any equitable relief. Nothing in plaintiffs' pre-trial or post-trial submissions indicates a desire on plaintiffs' part for the court to award equitable relief, other than "rescissory damages," *i.e.,* money damages, against Genser. *See Randall v. Loftsgaarden,* 478 U.S. 647, 656, 106 S.Ct. 3143, 92 L.Ed.2d 525 (1986) (stating that under the rescissory measure of damages, "the plaintiff is entitled to a return of the consideration paid, reduced by the amount realized when he sold the security and by 'any income' received on the security") (citation omitted). Plaintiffs' counsel made no mention of any other remedies at trial, and in fact conceded that plaintiffs' claim against Genser is for monetary damages. *See* Tr. at 687 ("What we are concerned here with is a claim of breach of fiduciary duty, . . . which is an action not for fair price alone, it's an action for damages . . . ."). Indeed, it is questionable whether this court would have the power to grant any form of equitable relief at this point in the case, when the corporation at issue is no longer a party. Plaintiffs have certainly provided no support for the proposition that it would.

**337**

more, plead a wrong to the corporation only, for which a shareholder may sue derivatively but not individually."). It must therefore be dismissed for that reason, as well.

### Conclusion

For the reasons stated above, this case is dismissed with prejudice.

SO ORDERED.